#30787, #30788-r-JMK
**2026 S.D. 21**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,  Plaintiff and Appellee,

v.

RICHARD SPRY,  Defendant and Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STATE OF SOUTH DAKOTA,  Plaintiff and Appellee,

v.

SUSAN SPRY,  Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
BON HOMME COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHERYLE W. GERING
Judge

* * * *

JOHN R. HINRICHS of
Heidepriem, Purtell, Siegel
Hinrichs & Tysdal, LLP
Sioux Falls, South Dakota  Attorneys for defendants and
appellants.

* * * *

ARGUED
OCTOBER 8, 2025
OPINION FILED **04/01/26**

\* \* \* \*

MARTY J. JACKLEY
Attorney General

RENEE STELLAGHER
Assistant Attorney General
Pierre, South Dakota

Attorneys for plaintiff and appellee.

#30787, #30788

KERN, Retired Justice

[¶1.]	Susan and Richard Spry managed their uncle Richard Hermanek's finances under a power of attorney. The Sprys opened a joint Mutual of Omaha bank account in Omaha, Nebraska, in 2018, titled in the names of Hermanek, Susan, and Richard.[1] Subsequent deposits included funds from Hermanek's bank account in Tyndall, South Dakota, proceeds from the sale of his home in Running Water, and a nursing home reimbursement check. When Hermanek died intestate on March 14, 2019, Susan transferred the remaining Mutual of Omaha balance by check to the Sprys' personal account in Texas. A Bon Homme County grand jury indicted Richard and Susan on a number of charges relating to the handling of Hermanek's property. After a three-day jury trial held in April 2024, both Sprys were convicted of several offenses including one count each of grand theft and one count of conspiracy to commit grand theft based on their unauthorized use and control of Hermanek's funds. The Sprys appeal. We reverse and remand.

**Factual and Procedural Background**

[¶2.]	Richard Hermanek was born and raised in Tyndall, South Dakota. He was a healthy, active man who worked for decades at the Bon Homme County Highway Department and built a home in Running Water. He never married, but had relatives in the area including nieces, nephews, and his older sister, Milada.

[¶3.]	Hermanek suffered a stroke in 2012, at the age of 82, that left him with aphasia, garbled speech, and difficulty communicating. After spending several

---

1.	We identify Richard Hermanek by his last name to avoid confusion with his nephew, Richard Spry.

weeks in the hospital, he left his home in Running Water and moved in with Milada, who was living in a home in Tyndall owned by her son, Richard Spry, and his wife, Susan. During the approximately six years that Hermanek lived with Milada, the Sprys and their sons, particularly Brenton, regularly spent time with them. The Sprys traveled from Omaha—and later Texas after they relocated—for visits, holidays, and time at Milada's home. They also spent time at Hermanek's home in Running Water before he moved in with Milada. During these years, Hermanek was able to drive and generally managed his own finances.

[¶4.] Milada broke her hip in 2018 and was placed in the Good Samaritan Society nursing home in Tyndall. Milada had previously executed a power of attorney (POA) naming Richard and his wife Susan as her attorneys-in-fact. On July 25, 2018, Hermanek also met with attorney Lisa Rothschadl and executed a POA naming Richard and Susan as his attorneys-in-fact. Unable to manage in the house without Milada, Hermanek moved into an assisted living apartment located next door to the nursing home. On one occasion, he went to the nursing home in the middle of the night, wearing only his underwear, looking for Milada. Thereafter, Richard and Susan helped Hermanek transition into a double room in the nursing home. While acting under the POA, the Sprys managed Hermanek's finances and property, paid his expenses, and prepared his Running Water home for sale. They used the sale proceeds and existing bank funds for his expenses, reimbursed their travel to South Dakota connected to his care, compensated themselves for work performed while readying the house for sale, and collected a monthly POA maintenance fee.

[¶5.]      Hermanek was assessed by the nursing home staff shortly after he was admitted. Julie Rothschadl, a licensed practical nurse and social worker, described Hermanek as a cooperative and pleasant man who was confused. After Hermanek made multiple attempts to leave the facility, a wander-guard bracelet was placed on his arm to alert staff if he attempted to leave the building. Cognitive testing between August and December 2018 revealed Hermanek's significant mental decline over time. Nursing staff conducted frequent Brief Interview for Mental Status (BIMS) assessments during his stay at the nursing home to test his cognitive ability.[2] In August 2018, Hermanek had a BIMS score of 9, indicating he was "moderately impaired" according to Julie's testimony. During that assessment, Hermanek failed to correctly report the current month or day of the week and was unable to recall two of the three words presented to him before the questions regarding the date were given. Notably, he only recalled the word "blue" after being prompted with the clue "a color," and he was unable to recall other words even with prompting.

_____

2.    BIMS is a federally mandated capacity assessment used in nursing homes that uses recall and temporal orientation questions to assess a resident's cognitive capacity. Scores range from 0 to 15, where 13 to 15 is cognitively intact, 8 to 12 is moderately impaired, and 0 to 7 is indicative of severe impairment. In performing the assessment, the examiner presents three words to the patient—sock, blue, and bed—and asks the patient to repeat them. A patient can earn three points by correctly recalling all three words. Then, the examiner assesses temporal orientation by asking the patient to state the current month, year, and day of the week. The points for each question vary based on how close the patient's response is to the correct answer. For example, a correct year earns three points, but being off by two to five years earns only one. Finally, the patient is asked to recall the three words that were presented at the start of the assessment. Each recall without a cue is worth two points, where a recall after being cued is worth one point.

[¶6.]     Susan called the nursing home in September 2018 and expressed to Julie that she felt Hermanek was very vulnerable and could be talked into anything. She asked that he not be allowed to leave the facility with anyone but family. Through the last few months of 2018, Hermanek's BIMS scores varied, but generally decreased over time, with staff documenting a score of 4 in November 2018. Sheri Fischer, a licensed social worker at the nursing home, testified that this score indicated Hermanek had "severe cognitive impairment" at the time of the November assessment. In addition, Hermanek had BIMS scores of 7, 6, and 2 when he was tested in December 2018.

[¶7.]     The Sprys continued to manage Hermanek's affairs from their home in Nebraska, and later from their home in Texas. Over time, however, they became frustrated with the location of Hermanek's existing bank account at Security State Bank in Tyndall because of what they perceived as a lack of privacy and convenience. To remedy this problem, they decided to open a Mutual of Omaha bank account titled jointly in the names of Hermanek, Susan, and Richard. Susan testified that the purpose of opening the new account was to give her easier access to pay Hermanek's bills. She explained that she "wanted to take the money from Security State if—whatever I could—so whenever it was needed, it would be available, and I wouldn't have to argue with them." Attorney Rothschadl corroborated that Susan was dissatisfied with the bank in Tyndall and that Susan thought the staff members were "awfully nosy."

[¶8.]     Susan testified she spoke with Hermanek about the account on two occasions, explained why she was opening the new account, and that he "seemed

fine with it." Additionally, she explained that at the time the account was opened, she expected Hermanek would live just a couple more years, and she anticipated that by the time of his death, all of his money would have been expended for his care.

[¶9.]        To get the paperwork signed for the new bank account, Loveada Way, an employee of the Sprys, and Brenton drove from Texas to South Dakota to present the paperwork to Hermanek. Neither Susan nor Richard were present. Way and Brenton's account of Hermanek's capacity during this time frame differs significantly from the testimony of the nursing home employees.

[¶10.]        Nurse Nikki Chladek remembered Hermanek and testified that he was friendly but often confused, requiring frequent redirection. She explained that when Way and Brenton came to visit with the paperwork, Hermanek had a urinary tract infection (UTI), was confused, and was attempting to leave the facility more often—a pattern she associated with his UTI-related confusion. On the day of the visit, he was wearing a jacket and had two blankets over him. When asked at trial whether Hermanek recognized Way or Brenton, Chladek testified: "Oh no. They said hi to him, but he didn't recognize them[,]" explaining that "[h]e was confused."

[¶11.]        In contrast, Brenton testified he had no doubt Hermanek recognized him and that they told Hermanek, "Hey Richard, this is the bank account stuff we talked about." Way testified that she explained the effect of the joint bank account agreement, informing him that he, Richard, and Susan would have access to the account to pay expenses, and that any funds remaining at death would pass to the Sprys. She told the jury that Hermanek nodded his head, eagerly reached for the

pen without being prompted, and signed the agreement. However, the State objected to, and the court prohibited as inadmissible hearsay, Way's account of Hermanek's alleged contemporaneous verbal statements of "Mmm-hmm" and "Susie, yes" while Way explained the account.

[¶12.] Although Susan, Way, and Brenton testified that survivorship was discussed, the survivorship selection box on the joint bank account agreement form was left blank. During trial, and prior to the settlement of the instructions, the circuit court concluded as a matter of law that the document in and of itself did not reflect an intent by Hermanek to elect survivorship. The proceeds from the sale of Hermanek's home—$97,872.07—were later placed, at Susan's direction, in this Mutual of Omaha account, along with $75,000 from the Security State Bank account and a $673.10 reimbursement check from the nursing home for an overcharge.

[¶13.] Other witnesses testified regarding Hermanek's mental capacity. Longtime friend Jeffrey Rueb stated that post-stroke but pre-nursing-home, Hermanek's speech was "kind of garbled," but that he answered questions, made eye contact, and appeared to understand conversations. Laura Sucha, who owned a restaurant Hermanek visited daily before his stroke, testified that she observed his difficulties with communication but did not believe he had cognitive impairment. Judy Rueb, who delivered meals to Hermanek in Tyndall, testified that he was slower after the stroke, but not cognitively impaired. In contrast, Barbara Hermanek-Peck, Hermanek's niece, testified that after the stroke, she could not truthfully say that Hermanek recognized either her or her husband. Additionally,

Barbara testified that Hermanek had misidentified her, calling her by her mother's name. She also recalled that there were times when Hermanek did not recognize other family members and friends. Betty Merritt, another niece of Hermanek's, confirmed that he failed to recognize her and other family members who visited him at the nursing home. Merritt also recounted watching Hermanek struggle while trying to order a piece of pizza from a business during the time he was living with Milada, explaining that the transaction was "over his head."

[¶14.] Hermanek died intestate on March 14, 2019. Five days after his passing, Susan wrote a check from the Mutual of Omaha account for $170,000, closed the account, and deposited the check into the Sprys' personal account at Beacon Federal Credit Union in Texas. Concerned relatives who would have inherited from Hermanek filed a civil suit in federal court against the Sprys.[3] Their attorney notified law enforcement of the Sprys' activities and an investigation ensued.

[¶15.] The Sprys were jointly indicted by a Bon Homme County grand jury. In Count 1, they were charged with grand theft in violation of SDCL 22-30A-17 for

---

3. We addressed three certified questions arising from this federal litigation. *Matter of Certification of Question of Law from United States District Court, District of South Dakota*, 2022 S.D. 60, 981 N.W.2d 325. The certified issues concerned (1) whether SDCL chapter 21-65 creates a private right of action that survives a vulnerable adult's death; (2) whether a civil cause of action for exploitation of an elder under SDCL 22-46-3 and SDCL 22-46-13 requires a prior criminal conviction for theft by exploitation under SDCL 22-46-3; and (3) whether a civil claim may proceed for violation of SDCL 22-46-1 and SDCL 22-46-13, with no requirement for a preceding criminal conviction. We held that the statutory right to seek relief under chapter 21-65 does not survive the vulnerable adult's death, that a criminal conviction is not required to sustain a civil claim under SDCL 22-46-13, and that a preceding criminal conviction is not required to pursue relief under SDCL 22-46-3.

taking or exercising unauthorized control over Hermanek's property in an amount more than $100,000 but less than or equal to $500,000, a Class 3 felony. In Count 2, they were each charged with conspiracy to commit grand theft in violation of SDCL 22-30A-17 and SDCL 22-3-8 based on their alleged unauthorized use and control of the Mutual of Omaha funds.

[¶16.]     Additionally, Susan was indicted in Counts 3–5 for grand theft by exploitation relating to the transfer of two of Hermanek's cars to Brenton and certain other claimed reimbursements for travel and other expenses.[4] In Count 6, Richard was charged with grand theft in violation of SDCL 22-30A-17, a Class 6 felony, for depositing, in his personal bank account, Hermanek's 2018 tax refund, which he received after Hermanek's death and the subsequent expiration of the POA. In Count 7, Susan was charged with one misdemeanor count of theft by exploitation in violation of SDCL 22-46-3 for taking the April 2019 POA maintenance fee after Hermanek's death in March. The Sprys pled not guilty, and the case proceeded to trial.

[¶17.]     At the close of the evidence, the Sprys requested an instruction on testamentary capacity regarding Hermanek's intent to enter into the Mutual of Omaha account agreement. They argued that the joint account, with its right of survivorship, was intended to be testamentary in nature considering Way and Brenton's testimony regarding Hermanek's intent at the time he signed the account

---

4.     Counts 3, 4, and 5 were charged under SDCL 22-46-3. Counts 3 and 4 were charged as Class 4 felonies for taking sums in an amount more than $5,000 but less than or equal to $100,000. In Count 5, Susan was charged with taking more than $1,000 but less than or equal to $2,500, a Class 6 felony.

paperwork. The State objected and instead proposed an instruction advising the jury regarding the capacity to contract, arguing the joint account agreement was contractual in nature. The court treated the Mutual of Omaha agreement as a contract and instructed the jury that contractual capacity was required to find the contract valid, rejecting the Sprys' proposed instruction on testamentary capacity.

[¶18.]      The court also instructed the jury that the ordinary presumption that a joint account carries survivorship rights could be rebutted by clear and convincing evidence of contrary intent. The same instruction apprised jurors they could not convict the defendants of any charge unless the State proved every element of the offense beyond a reasonable doubt.

[¶19.]      Both Susan and Richard Spry were convicted of Count 1, grand theft, and Count 2, conspiracy to commit grand theft. Richard was also convicted of Count 6, misdemeanor grand theft, for the offense involving the tax refund. Susan was convicted of Count 7, misdemeanor theft by exploitation, for taking the April 2019 maintenance fee. She was acquitted on grand theft by exploitation, Counts 3–5, arising from the car transfers and reimbursements. The court ordered a presentence investigation and set the matter for a sentencing hearing.

[¶20.]      The court sentenced Richard on Count 1, grand theft, to five years in the penitentiary, all suspended on the condition that he successfully complete four years' probation and satisfy numerous terms, including payment of a $30,000 fine, restitution, costs of prosecution, and court costs. The court sentenced Richard on Count 2, conspiracy to commit grand theft, to five years in the penitentiary for each offense, all suspended on the condition that he successfully complete four years'

probation and satisfy numerous terms, including payment of a $10,000 fine, restitution, costs of prosecution, and court costs. For Count 6, the grand theft charge involving the tax return, the court sentenced Richard to two years in the penitentiary, suspended on similar terms and conditions. All of the sentences were concurrent.

[¶21.] Similarly, the court sentenced Susan on Counts 1 and 2, the grand theft count and the conspiracy count, to five years in the penitentiary, suspended on the condition that she successfully complete four years' probation and pay all fines, restitution, and costs. The sentences were again concurrent. For Count 7, the theft by exploitation count, the court ordered Susan to pay restitution, a fine, and court costs. This appeal concerns only Count 1 and Count 2, the grand theft and conspiracy convictions, involving the Sprys' handling of the Mutual of Omaha joint account.

[¶22.] The Sprys appeal, raising three issues, which we restate as follows:

1. Whether the circuit court erred by giving a jury instruction on capacity to contract.

2. Whether the circuit court erred by prohibiting testimony regarding Hermanek's contemporaneous statements made while signing the joint account agreement.

3. Whether the circuit court erred when instructing the jury as to the State's burden of proof regarding Hermanek's intent.

## Analysis

### 1. Whether the circuit court erred by giving a jury instruction on capacity to contract.

[¶23.] This Court "generally review[s] a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard." *State v. Ortiz-Martinez*, 2023 S.D. 46, ¶ 36, 995 N.W.2d 239, 246 (quoting *State v. Schumacher*, 2021 S.D. 16, ¶ 25, 956 N.W.2d 427, 433). "An abuse of discretion 'is a fundamental error of judgment, a choice outside the reasonable range of permissible choices, a decision . . . [that], on full consideration, is arbitrary or unreasonable.'" *Hood v. Straatmeyer*, 2025 S.D. 12, ¶ 7, 18 N.W.3d 649, 654 (alteration and omission in original) (quoting *Coester v. Waubay Twp.*, 2018 S.D. 24, ¶ 7, 909 N.W.2d 709, 711). "However, 'a court has no discretion to give incorrect or misleading instructions, and to do so prejudicially constitutes reversible error.'" *State v. Nelson*, 2022 S.D. 12, ¶ 42, 970 N.W.2d 814, 828 (quoting *State v. Liaw*, 2016 S.D. 31, ¶ 18, 878 N.W.2d 97, 102). Accordingly, this Court "consider[s] jury instructions as a whole, and if they correctly state the law and inform the jury, they are sufficient." *Ortiz-Martinez*, 2023 S.D. 46, ¶ 36, 995 N.W.2d at 247 (citation modified). "The party asserting error has the burden of showing prejudice in failure to give a requested instruction." *Suvada v. Muller*, 2022 S.D. 75, ¶ 33, 983 N.W.2d 548, 559 (quoting *Bauman v. Auch*, 539 N.W.2d 320, 323 (S.D. 1995)).

[¶24.] The Sprys contend the circuit court erred in giving a jury instruction on capacity to contract instead of testamentary capacity. They maintain that Hermanek intended any remaining funds in the Mutual of Omaha account to pass to the Sprys on death, and that the proper jury instruction would have been one

defining testamentary capacity. In contrast, the State argues the execution of the joint account agreement was a contract and that the proper jury instruction was one which described the standard for contractual capacity. In holding that the Mutual of Omaha Bank account form required contractual capacity, thereby necessitating a jury instruction on contractual instead of testamentary capacity, the circuit court informed the parties that it had considered the form's language, SDCL 29A-6-106, Will Contests § 10:3 (2d ed.), *Johnson v. Markve*, 2022 S.D. 57, 980 N.W.2d 662, and *Wenzel-Mosset v. Nickels*, 1998 N.D. 16, 575 N.W.2d 425. The significant language from Will Contests § 10:3 (2d ed.) provides:

> A bank account agreement is a contract, and in the very few cases in which the donor's capacity to contract has been challenged, the courts have required the donor to have the ability to understand the nature and effect of the bank deposit contract in order to make a depositary contract with a bank. The standard for testamentary capacity has generally not been applied to bank account deposits that function as will substitutes.

Hon. Eunice L. Ross & Thomas J. Reed, Will Contests § 10:3 (2d ed. 2023) (footnote omitted).

[¶25.] Testamentary intent concerns whether the instrument was meant to operate as a revocable disposition effective at death, shown by the writing and surrounding circumstances. *In re Nelson's Estate*, 274 N.W.2d 584, 587 (S.D. 1978) (citing *In re Nelson's Estate*, 250 N.W.2d 286, 288 (S.D. 1977)). In *Johnson v. Markve*, this Court held that lifetime real estate gifts "are testamentary in nature when the record indicates that they were executed 'with a mind toward disposition of the real property following [the testator's] death.'" 2022 S.D. 57, ¶ 32, 980 N.W.2d at 672–73 (alteration in original) (quoting *Stockwell v. Stockwell*, 2010 S.D.

79, ¶ 26, 790 N.W.2d 52, 62). However, when the testamentary effect arises from the parties' contractual assent, for example, in the formation of a joint bank account, courts apply the contractual capacity standard. *Wenzel-Mosset*, 1998 N.D. 16, ¶¶ 12–17, 575 N.W.2d at 428–29.

[¶26.] In *Wenzel-Mosset*, the North Dakota Supreme Court applied the contractual capacity standard—requiring proof "the grantor was unable to comprehend the nature and effect of the transaction"—for a joint bank account that had testamentary effect. *Id.* ¶ 13, 575 N.W.2d at 429. Thus, *Wenzel-Mosset* stands for the proposition that testamentary consequences alone do not change the inquiry—if the effect arises from contract, courts apply the contractual capacity standard. *Id.* We find this authority persuasive. *Wenzel-Mosset* is distinguishable from *Johnson v. Markve* because *Johnson* addressed a lifetime real estate conveyance, whereas *Wenzel-Mosset* concerned entering into a joint bank account agreement—a distinction the circuit court explicitly relied upon when denying the Sprys' proposed instruction.

[¶27.] Here, Hermanek was presented with and signed a standard joint bank account form. As *Wenzel-Mosset* makes clear, even if a joint bank account agreement has testamentary effect, the governing standard to enter into the agreement itself is contractual capacity. The Sprys' proposed instruction providing for testamentary capacity did not accurately state the applicable law, and the circuit court did not abuse its discretion by instead providing an instruction on capacity to contract.

> **2.  *Whether the circuit court erred by prohibiting testimony regarding Hermanek's contemporaneous statements made while signing the joint account agreement.***

[¶28.]    This Court similarly reviews evidentiary rulings under an abuse of discretion standard. *State v. Rouse*, 2025 S.D. 29, ¶ 24, 23 N.W.3d 467, 475–76 (citing *State v. Belt*, 2024 S.D. 82, ¶ 20, 15 N.W.3d 732, 737). In addition to proving an abuse of discretion, "an evidentiary error 'must also be shown to be prejudicial'" to be granted relief. *Id.* ¶ 24, 23 N.W.3d at 476 (quoting *Belt*, 2024 S.D. 82, ¶ 20, 15 N.W.3d at 737). To establish prejudice, one must show there is "a reasonable probability that, but for [the error], the result of the proceeding would have been different." *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686 (alteration in original) (citation omitted). "In other words, 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (citation omitted).

[¶29.]    The Sprys argue the circuit court erred in prohibiting Way's testimony concerning Hermanek's contemporaneous statements made during the execution of the Mutual of Omaha joint account agreement and that the preclusion of this testimony was prejudicial. In describing Hermanek's signing of the agreement, Way testified that after she explained the agreement to Hermanek, including the right of survivorship, Hermanek shook his head in agreement, reached for the pen willingly without Way prompting him, and signed it. However, the circuit court prohibited Way from testifying that Hermanek, in response to Way's explanation of the agreement, stated "Mmm-hmm" and "Susie, yes"—Hermanek's nickname for Susan. According to the Sprys, Hermanek's out-of-court statements are admissible

either as verbal acts or under the catch-all exception to the hearsay rule in SDCL 19-19-803(3).

[¶30.]     "Verbal acts are those 'out-of-court statements [that] are operative legal facts which constitute the basis of a claim, charge or defense . . . and are nonhearsay.'" *State v. Charger*, 2000 S.D. 70, ¶ 25, 611 N.W.2d 221, 226 (alteration in original) (quoting *Banks v. State*, 608 A.2d 1249, 1254 (Md. 1992)).  These are statements with "a certain legal effect, [where] the sincerity and reliability of the declarant is of no consequence; the simple fact that such statements are made is relevant." *Id.* (quoting *Banks*, 608 A.2d at 1254).  We analyzed such statements in *Charger*, where the defendant paid his cellmate to place a call to intimidate a witness.  *Id.* ¶ 3, 611 N.W.2d at 223.  The State did not offer the cellmate's statements for the truth of the matters asserted during the call.  *Id.* ¶ 27, 611 N.W.2d at 227.  Instead, the State offered evidence of the telephone conversation to show that the defendant had induced a third party to make threatening statements to a witness in an effort to discourage that witness from testifying.  *Id.*  This act was the basis of the witness tampering charge at issue.  *Id.* ¶ 21, 611 N.W.2d at 225.  Therefore, this Court held the verbal acts rule applied, not to prove the truth of the statement, but to show that the call occurred.  *Id.* ¶ 27, 611 N.W.2d at 227.  Likewise, in *State v. Harris*, statements made during a drug transaction were properly admitted as verbal acts to show that the unlawful distribution of drugs took place, not for the truth of the statements made.  2010 S.D. 75, ¶ 15, 789 N.W.2d 303, 309.

[¶31.]     Here, Hermanek's statements were not verbal acts, as they did not operate with legal effect as the statements in *Charger* and *Harris* did, where the very act of making the statements was the basis for underlying criminal charges. Instead, the Sprys seek to offer Hermanek's out-of-court statements for the truth of the matter asserted, primarily to prove Hermanek voluntarily signed the document with the intent to benefit Richard and Susan after his death through the right of survivorship. The circuit court therefore did not abuse its discretion in ruling that the statements were not verbal acts.

[¶32.]     The Sprys next assert that the circuit court erred in rejecting their alternative argument that Hermanek's statements were admissible under SDCL 19-19-803(3), which provides: "A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition . . ., but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will" is not excluded by the rule against hearsay. The court determined that the latter part of this rule precluding statements of belief to prove a fact believed applied here.

[¶33.]     However, when explaining why it viewed Hermanek's statement as an expression of his belief as to what he was signing and why he was signing it, the circuit court incorrectly stated that Way "did not discuss the document with [Hermanek], other than this is what Susan Spry talked with him about." But Way did, in fact, testify that she discussed the joint account agreement with Hermanek, after which Hermanek nodded his head and said, "Mmm-hmm" and "Susie, yes." In this context, these statements were admissible under SDCL 19-19-803(3) to show

Hermanek's then-existing state of mind and intent to execute the document for the purposes explained to him. We therefore conclude that the circuit court abused its discretion when it excluded the evidence under SDCL 19-19-803(3). Given our resolution of the next issue, we need not address whether the Sprys were prejudiced by this ruling.

> **3. Whether the circuit court erred when instructing the jury as to the State's burden of proof regarding Hermanek's intent.**

[¶34.] "Whether a jury instruction correctly states the law is a question of law" this Court reviews de novo. *State v. Birdshead*, 2015 S.D. 77, ¶ 23, 871 N.W.2d 62, 72 (citing *State v. Waloke*, 2013 S.D. 55, ¶ 28, 835 N.W.2d 105, 113). "Under this de novo standard, we construe jury instructions as a whole to learn if they provided a full and correct statement of the law." *State v. Pfeiffer*, 2024 S.D. 71, ¶ 38, 14 N.W.3d 636, 647 (quoting *State v. Black Cloud*, 2023 S.D. 53, ¶ 50, 996 N.W.2d 670, 683).

[¶35.] The jury instruction at issue, Instruction 25, related to the grand theft and conspiracy to commit grand theft charges on which the Sprys were both convicted. These charges pertained to the funds that were transferred from Hermanek's bank account in Tyndall to the Mutual of Omaha bank account titled jointly in the names of Hermanek, Richard, and Susan. The circuit court instructed the jury on the elements that must be proven beyond a reasonable doubt to find the Sprys guilty of grand theft, including the taking or exercising of unauthorized control over money that belonged to Hermanek. In addition to the elements instruction, the court gave Instruction 25, which explained that there is a

rebuttable presumption that the creator of a joint bank account "intended rights of survivorship to attach to it upon the creator's death, meaning all of the money in the account would go to the surviving parties named on the account." This instruction further stated that such presumption could be rebutted by clear and convincing evidence that Hermanek "merely intended the arrangement for his own benefit or convenience." The Sprys claim herein, as they did below, that Instruction 25 "lowered" the State's burden of proving beyond a reasonable doubt that they exercised unauthorized control over money belonging to Hermanek, i.e., the money in the Mutual of Omaha account.

[¶36.]     This language in Instruction 25 accurately sets forth a presumption and the corresponding burden of proof that must be met to rebut it, as contemplated in SDCL 29A-6-104. It is appropriate to provide such guidance when ownership of joint accounts is challenged in a civil lawsuit. However, when a dispute of ownership corresponds with an element the State must prove in a criminal case, the clear and convincing evidence burden that would otherwise apply in a civil lawsuit to rebut the presumption of survivorship rights is subsumed in the higher burden of proof the State must meet in a criminal case. Because the ownership of the funds in the bank account was an element the State had to prove beyond a reasonable doubt, instructing the jury that the State could rebut the presumption of joint ownership with rights of survivorship by clear and convincing evidence was erroneous, as a matter of law.

[¶37.]     The State focuses on additional language at the end of Instruction 25 stating that even if the jury found clear and convincing evidence that Hermanek did

not intend rights of survivorship to attach to the Mutual of Omaha account, the jury could not find the Sprys guilty of grand theft or the related conspiracy charge unless the State proved all of the elements of those offenses beyond a reasonable doubt. But, when presented with a similar scenario in other cases, we have rejected the notion that giving an incorrect instruction on the burden of proof is not reversible error if the burden of proof was correctly provided to the jury in other instructions.

[¶38.] In *State v. Whistler*, we noted the well-established principle that "no court has discretion to give incorrect, misleading, conflicting, or confusing instructions[.]" 2014 S.D. 58, ¶ 13, 851 N.W.2d 905, 910 (alteration in original) (quoting *State v. Zephier*, 2012 S.D. 16, ¶ 9, 810 N.W.2d 770, 772). When discussing the types of error in the context of jury instructions that would warrant a reversal, we cited *State v. Evans*, 81 N.W. 893 (S.D. 1900), as an example of such a case. *Id.* ¶ 17, 851 N.W.2d at 911. In *Evans*, the trial court erroneously instructed the jury that the State must establish the defendant's guilt with respect to the charge at issue by a preponderance of the evidence. 81 N.W. at 893–94. On appeal, the State acknowledged this instruction was patently erroneous, but argued that a reversal was not required because another instruction advised the jurors that they could not convict the defendant unless they were satisfied that the State had proven the elements of the charged offense beyond a reasonable doubt. *Id.* at 894. The Court disagreed and explained its reasoning as follows:

> [T]he jury had before them the erroneous rule, as well as the correct rule, as to the evidence required in finding their verdict. It is impossible for this [C]ourt to know which rule the jury adopted, or by which they were governed, in arriving at their verdict in this case. . . . "To warrant a reversal for contradictory instructions, it is enough to know that error may have

> intervened, and it has been said that a reversal cannot be refused merely because the record does not show affirmatively that injury has been done. The reason for the rule is obvious; for, where the instructions on a material point are contradictory, it is impossible for the jury to decide which should prevail, and it is equally impossible, after verdict, to ascertain what instruction the jury did follow."

*Id.* (citation omitted). The Court therefore reversed and remanded for a new trial after concluding that the mistaken instruction "may have induced [the jury] to convict the defendant upon less cogent evidence than the criminal law requires." *Id.* (citation omitted).

[¶39.]     While it is not inappropriate to instruct a jury on a statutory presumption relevant to an element that must be proven in a criminal case, a court must be careful not to confuse the lesser burden of proof needed to rebut a presumption that applies in civil cases with the more stringent burden that must be applied in criminal cases. In a slightly different, but analogous case, we considered whether a general instruction of the State's burden of proof neutralized an error in instructing a jury on a different type of presumption related to an element of a criminal offense.

[¶40.]     In *State v. Robinson*, a defendant was charged with multiple counts of passing checks without sufficient funds in the underlying accounts. 1999 S.D. 141, 602 N.W.2d 730. One of the elements of this crime was an intent to defraud. *Id.* ¶ 12, 602 N.W.2d at 733 (citing SDCL 22-41-1, which has since been repealed and transferred to SDCL 22-30A-24). The jury in *Robinson* was instructed on a provision in SDCL 22-41-2 (now codified in SDCL 22-30A-27) that "[t]he passing of a check as prohibited by [SDCL 22-41-1] is prima facie evidence that the person who

passed it had knowledge of insufficient funds in the account on which the check was drawn[.]" *Id.* Although the jury was further instructed that such presumption could be contradicted by other evidence, this instruction did not include the advisories required by SDCL 19-19-4 (Rule 302(c)) (now codified in SDCL 19-19-302). These include statements advising the jurors that they were not required to find the presumed fact to be sufficient evidence, and that if the presumed fact is an element of the offense, the existence of the element must be proven beyond a reasonable doubt. *Id.* ¶ 13, 602 N.W.2d at 733–34; *see generally State v. McDonald*, 421 N.W.2d 492 (S.D. 1988) (noting the failure to instruct a jury in accord with this rule is reversible error).

[¶41.]     Relevant here, we then considered whether this error required a reversal given that the jury was separately instructed generally that the State had the burden of proving every element of the charge beyond a reasonable doubt, and that the burden never shifts to the defendant. *Id.* ¶ 14, 602 N.W.2d at 734. We deemed the relevant question to be "whether reasonable jurors could have understood that the knowledge presumption shifted the burden of proof to [the defendant] on the element of knowledge upon proof of the predicate act." *Id.* ¶ 16, 602 N.W.2d at 734–35. Ultimately, we concluded that the general burden instruction did not overcome the defective instruction that improperly "reliev[ed] the State of proving an essential element on all the evidence beyond a reasonable doubt." *Id.* ¶ 16, 602 N.W.2d at 735. Because this issue was not raised below, we applied a plain error review, reversed the defendant's conviction, and remanded for a new trial. *Id.* ¶ 17, 602 N.W.2d at 735.

[¶42.] Here, the Sprys' primary asserted defense to the grand theft charges was that they did not exercise control over Hermanek's money because they were joint owners of the Mutual of Omaha bank account with rights of survivorship upon his death. To support this claim, they relied upon the statutory presumption in SDCL 29A-6-104 and asked the circuit court to instruct the jury on such presumption, along with the advisory that the State must rebut this presumption with evidence proving beyond a reasonable doubt that Hermanek had a different intent. But the court denied the Sprys' requested instruction and instead gave the State's proposed instruction that incorrectly stated the presumption could be rebutted by clear and convincing evidence.

[¶43.] Further compounding the error, the following paragraph in Instruction 25 defined clear and convincing evidence as evidence that "is more than a mere preponderance of the evidence but need not be beyond a reasonable doubt." Although this is a correct definition, it undoubtedly emphasized the notion that the State did not have to rebut the presumption of joint ownership rights beyond a reasonable doubt. And while the last paragraph in Instruction 25 advised the jury that the State has the burden of proving the elements of grand theft beyond a reasonable doubt, a reasonable juror could likely conclude that the first two paragraphs must be talking about something other than an element of the offense. If that were not the case, the preceding references to the clear and convincing evidence burden of proof would seem meaningless. Instruction 25 contained no language making it clear to the jury that the first paragraph related to the Sprys' affirmative defense—that they had survivorship rights in the Mutual of Omaha

funds—a defense that could potentially negate one of the elements of grand theft. The State thus had the burden to rebut this defense beyond a reasonable doubt. *See, e.g., State v. Knecht*, 1997 S.D. 53, ¶ 10, 563 N.W.2d 413, 418 (citing *State v. Burtzlaff*, 493 N.W.2d 1, 7 (S.D. 1992)) (noting that "[w]hen a defendant raises the affirmative defense of self-defense, it is incumbent upon the State to prove beyond a reasonable doubt that the killing was without authority of law").

[¶44.] Therefore, when considering the incorrect and confusing directives in Instruction 25, in its entirety, along with the other instructions as a whole, a reasonable juror could have understood that the State need only rebut the presumption that Hermanek intended the Sprys to have rights of survivorship in the joint bank account funds by clear and convincing evidence. Indeed, the State, in its closing argument, referred only to the clear and convincing evidence burden when arguing to the jury that it had produced evidence to rebut this presumption. For these reasons, we reverse the grand theft and conspiracy to commit grand theft convictions.

## Conclusion

[¶45.] We conclude the circuit court did not err by giving the jury instruction on capacity to contract instead of testamentary capacity. However, the court erred by not admitting Way's testimony of Hermanek's contemporaneous out-of-court statements under SDCL 19-19-803(3). We further conclude that the circuit court erred when instructing the jury on the burden of proof the State must meet to rebut the presumption that Hermanek intended the Sprys to have rights of survivorship with respect to the funds remaining in the joint bank account. Accordingly, we

reverse the grand theft and conspiracy to commit grand theft convictions and remand for further proceedings.

[¶46.]      JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.

[¶47.]      GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.